UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RAMON HERNANDEZ,

                    Plaintiff,

    – against –

INTERNATIONAL SHOPPES, LLC,
JOHN DOE CORPS. 1-5 AND JANE
DOES 1-5,
                    Defendants.

**MEMORANDUM & ORDER**

  13-CV-6615

**Parties**

Ramon Hernandez

International Shoppes, LLC

JOHN DOE CORPS. 1-5
JANE DOES 1-5

**Appearances**

Ty Hyderally
Hyderally & Associates, PC.
33 Plymouth Street, Suite 202
Montclair, NJ 07042
(973) 509-8500
tyh@employmentlit.com

Edward F. Westfield
Edward F. Westfield, P.C.
6218 Riverdale Avenue
Bronx, NY 10471
(718) 601-1100
efw@efwpc.com

Michael S. Horn
Steven B. Harz
Archer & Greiner P.C.
21 Main Street, Suite 353
Hackensack, NJ 07601
(201) 342-6000
mhorn@archerlaw.com
sharz@archerlaw.com

N/A

**JACK B. WEINSTEIN, Senior United States District Judge**

## Table of Contents

I.   Introduction ........................................................................................................ 3

II.   Facts ................................................................................................................... 5

   A.   Defendant International Shoppes, LLC ...................................................... 5

      1.   Storefronts and Kiosks at JFK ............................................................. 5

      2.   Human Resources Office Maintained at JFK ....................................... 6

         a.   Personnel ....................................................................................... 6

         b.   Procedures for Hiring Retail Sales Associates ............................. 6

      3.   Delivery of Merchandise to JFK, Terminal 5 Storefront and Airport Gates ....... 8

   B.   Plaintiff Hernandez ................................................................................. 10

      1.   Education .............................................................................................. 10

      2.   Employment History ........................................................................... 10

         a.   International Shoppes:  2006–2009 ........................................... 10

         b.   Solstice Sunglasses:  Early 2009 .............................................. 12

         c.   NewsLink:  2009–2012 .............................................................. 12

         d.   International Shoppes:  Mid 2012 ............................................. 13

   C.   Plaintiff's Three-Week Employment at International ............................. 16

   D.   EEOC Complaint .................................................................................... 18

III.   Standard ........................................................................................................... 19

IV.   Law .................................................................................................................. 21

   A.   Statutes .................................................................................................... 21

      1.   American Disabilities Act .................................................................... 21

         a.   Dialogue Between Congress and Supreme Court ........................ 21

         b.   Text .............................................................................................. 24

            i.   Discrimination ...................................................................... 24

            ii.   "Regarded as" Disabled ....................................................... 25

            iii.   Failure to Accommodate ...................................................... 25

            iv.   Retaliation ............................................................................ 27

      2.   New York State Human Rights Law .................................................... 27

      3.   New York City Human Rights Law ..................................................... 29

   B.   Disability Discrimination ........................................................................ 33

      1.   Law ...................................................................................................... 33

         a.   Prima Facie Case ......................................................................... 35

            i.   Applicability of ADA to Employer ...................................... 36

            ii.   Three-Step Test Used To Determine Whether Disability Exists ............... 36

               a)   Impairment ..................................................................... 37

               b)   Major Life Activity ........................................................ 38

               c)   Substantial Limitation .................................................... 38

            iii.   Plaintiff Otherwise Qualified to Perform Essential Functions of Job ........ 42

            iv.   Adverse Employment Action Taken ..................................... 46

         b.   Business Reason Proffered for Termination ................................. 47

         c.   Whether Proffered Business Reason Is Pretextual ....................... 48

2.   Application................................................................................................ 48
   a.   Prima Facie Case............................................................................ 48
   b.   Whether Proffered Business Reason for Termination Is Pretextual .............. 52
C.   Failure to Accommodate ................................................................................. 53
   1.   Law ............................................................................................................. 53
   2.   Application.................................................................................................. 53
D.   Retaliation ..................................................................................................... 54
   1.   Law ............................................................................................................. 54
   2.   Application.................................................................................................. 55
V.   Conclusion .......................................................................................................... 56

## I.   Introduction

Plaintiff sues based on a failure of defendant to accommodate his disability—a strained back that required him to abstain from lifting substantial weights of perfumes and liquors in connection with his sales job.  He deliberately concealed whatever disability he had when he was interviewed for employment.  He was physically capable of lifting the weights his employment required on occasion.  He never specifically complained of a failure to accommodate.  And he has no reasonable basis in the evidence to support a favorable verdict.

Defendant's motion for summary judgment is granted with respect to plaintiff's claims under the Americans with Disabilities Act.

Plaintiff's analogous claims under State and City law are dismissed without prejudice. They may be pursued in state court where the law relative to disability claims is still developing. This court has no further responsibility for this litigation.  Nevertheless, the magistrate judge is respectfully requested to assist the parties in the settlement of the non-federal claims in order to avoid further burdening state courts.

Defendant International Shoppes, LLC ("International" or "the company") operates multiple stores inside John F. Kennedy Airport ("JFK").  Plaintiff Ramon Hernandez, a 2007 high school graduate, was twice employed by the company as a "salesperson": *first*, from 2006

to 2009, and *second*, for three weeks in 2012. Alleged is that during his second session of employment with defendant, when it was discovered that there was a claimed back problem preventing plaintiff from lifting packaged merchandise, the company discriminated against him, refused to accommodate him, and ultimately retaliated against him by firing him, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, New York State's Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and New York City's Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8–107.

Plaintiff's claimed impairment, the extent of which is not clear, occurred in April 2011 while he was working as a delivery person for NewsLink LLC ("NewsLink"), an airport concessionaire located within JFK. Although NewsLink had offered plaintiff health insurance coverage, he declined it. After his claimed back injury, allegedly no longer able to perform deliveries, he incurred a ten percent pay cut and was staffed as a cashier. Informed by NewsLink that he would be terminated in April 2012—and confronted with the resulting prospect that his girlfriend would leave him and he would have to move in with his father and sleep on the floor— plaintiff applied to again work for defendant as a "salesperson."

It is uncontested that plaintiff did not disclose his back injury to defendant during his screening or official interview. Plaintiff's injury was first disclosed two weeks into his employment with defendant, on June 28, 2012, after he was asked by his immediate supervisor, Anirood Jairam, to transport merchandise from the stockroom to the store's shelves. One week later, after providing International with a doctor's note, which confirmed that an injury of some kind had occurred in April 2011 and would last until December 2012, plaintiff was fired.

Defendant contends that plaintiff's employment was ended because he failed to disclose that he was incapable of performing the essential functions of his job as a salesperson

specifically hired to work the "labor-intensive" 4:30 a.m. shift. Submitting documentary and testimonial evidence, International argues that plaintiff was aware that an essential requirement of the salesperson's job that he was applying for was the ability to lift bulk-packaged items weighing some twenty pounds.

Sufficient probative evidence tending to support plaintiff's disability discrimination claims has not been submitted. Having had a fair opportunity to conduct discovery, plaintiff cannot simply offer his word, which has consisted of multiple unreliable and inconsistent statements, to discredit documentary evidence and the corroborated testimony of defendant's deponents. The evidence demonstrates that plaintiff was informed during the screening interview process that the retail sales associate position he was applying for included delivery responsibilities requiring lifting weights he later claimed beyond him.

No rational factfinder could find in favor of plaintiff.

## II. Facts

### A. Defendant International Shoppes, LLC

#### 1. Storefronts and Kiosks at JFK

In 2012, the period of time relevant to this action, defendant International owned fifteen storefronts inside of four of JFK's six terminals: seven were located in Terminal 1, four were located in Terminal 8, and Terminals 3 and 5 each had one store. (Dep. of Deborah Sueskind 54:10–55:1, ECF No. 33-15 ("Sueskind Dep."); Dep. of Thomas Walsh-Steines 28:14–30:1, ECF No. 33-16 ("Walsh-Steines Dep.").) Of the fifteen stores owned, seven operated under the duty-free "International Shoppes" brand; the names of various luxury brands, *e.g.*, "Ferragamo" and "Bvlgari," were inscribed on the other eight storefronts. (Sueskind Dep. 52:19–54:3.) Four mobile kiosks, primarily located in Terminal 5, sold alcohol and cigarettes. (Sueskind Dep. 54:4–9; Walsh-Steines Dep. 29:14–17; Dep. of Anirood Jairam 31:12–14, ECF No. 33-14

("Jairam Dep.").)

## 2. Human Resources Office Maintained at JFK

### a. Personnel

Aside from the seven stores and singular mobile kiosk located in Terminal 1, the company also operated a satellite human resources office from this terminal. (Sueskind Dep. 26:25–26:1.) In 2012, Deborah Sueskind, who had been employed with the company since 2009, was International's Human Resources Manager, reporting directly to the company's vice-presidents and occasionally to the president. (*Id.* at 12:10–24, 14:7–14.) She had the authority to make independent decisions related to the hiring of applicants and the firing of employees. (*Id.* at 24:6–11.) At the time, Ali Dalipi, Human Resources Generalist, and Thomas Walsh-Steines, Human Resources Coordinator, reported directly to her. (*Id.* at 21:23–22:4, 22:24–23:5.)

Dalipi was Sueskind's right-hand, assisting her with all human resources-related issues. (*Id.* at 23:6–10.) He played a significant role in the company's recruitment efforts with respect to its fifteen stores and four mobile kiosks operating out of JFK. (*Id.* at 23:10–11.) Dalipi did not have the independent authority to hire or fire, but he could make such recommendations to the General Manager of International's JFK stores and kiosks, Lucy Salazar. (Sueskind Dep. 23:20–24, 24:18–20; Walsh-Steines Dep. 38:7–10.)

In March 2012, Walsh-Steines's primary responsibility was to screen job applicants for positions at International's JFK stores and kiosks. (Walsh-Steines Dep. 15:25–17; Sueskind Dep. 79:4–9.) At the time, he learned about position availability from Sueskind or Salazar. (Walsh-Steines Dep. 33:14–20, 34:13–35:8.)

### b. Procedures for Hiring Retail Sales Associates

Applicant screening involved reviewing resumes and holding weekly Tuesday open call recruitment sessions in the Terminal 1 food court. (Sueskind Dep. 20:6–19; Walsh-Steines Dep.

6

16:8–12.)  These open call sessions were not advertised; knowledge of them was spread by "word of mouth."  (Sueskind Dep. 20:6–7; Walsh-Steines Dep. 16:10.)  In 2012, these sessions were exclusively used to hire retail sales associates—the position for which plaintiff was ultimately hired.  (Walsh-Steines Dep. 35:14–19.)

Screening for the retail sales associate position involved asking applicants questions intended to gauge their suitability.  (*Id.* at 21:11–17; Sueskind Dep. 78:1–6.)  Walsh-Steines explained:

> I would ask them "what kind of schedule are you looking for, are you available on the weekends, are you able to stand or walk on your feet for up to eight hours at a time, are you comfortable with light cleaning, maintenance and the stock of our stores, and the ability to lift up to 25 pounds?"
> . . .
> I remember one of the main reasons I moved forward with Mr. Hernandez to put in front of [Dalipi] and [Salazar] was that he said that he had the capability of arriving at 4:30 [a.m.].  At that point, I did go into the specifics of the position, more specifically what would be required of him, since he would be starting at 4:30. . . .  I remember specifically explaining to Mr. Hernandez and saying to him that this would be a labor-intensive shift, meaning the first half of your shift would be doing deliveries, getting the stock, bringing it to the store and assisting with putting it on the shelves.  I then told him that once that's over, you'll have to assume sales responsibilities.

(Walsh-Steines Dep. 21:11–17; 49:7–24.)

The main responsibilities of retail sales associates included helping customers, selling merchandise, operating the register, cleaning, and restocking shelves.  (Jairam Dep. 23:17–24:1; *see also* Sueskind Dep. 67:4–11.)  Some retail sales associates were also hired as "delivery guys"; they had the additional responsibility of retrieving heavy inventory from the storage area to restock store shelves.  (Jairam Dep. at 28:16–17.)  International had a practice of only hiring men to fill these retail sales associate/delivery positions.  (*Id.* at 25:24–26:4.)  Whether a retail

sales associate was hired to execute the additional responsibilities of "delivery guy" was communicated to the Assistant Manager of the storefront where the individual had been slotted to work by Human Resources. (Jairam Dep.42:18–20.) In 2012, according to Walsh-Steines, *all* retail sales associates needed to have the ability to lift up to twenty-five pounds. (Walsh-Steines Dep. 24:1–3.)

If an applicant's abilities aligned with the position's requirements, Walsh-Steines would make a hiring recommendation to Dalipi and Salazar. (*Id.* at 16:25–17:5.) On the same day of the open call, if the two received a recommendation from Walsh-Steines, they would jointly interview the prospective employee. (*Id.* at 17:3–17.) Once a hiring determination was made, Walsh-Steines would contact the applicant and extend an offer of employment. (*Id.* at 38:11–13.)

### 3. Delivery of Merchandise to JFK, Terminal 5 Storefront and Airport Gates

During the relevant time period, Valley Stream, New York housed the company's main corporate office and its warehouse for all store inventories. (*Id.* at 15:14–19, 25:17.) Inventory stocked at the warehouse, including alcohol, cigarettes, chocolate, and cosmetics, was packaged in bulk. (Sueskind Dep. 120:5–15; Jairam Dep. 31:11–18.) A truck loaded with merchandise contained in sealed boxes and grey bins would daily travel from Valley Stream to JFK. (Jairam Dep. 31:11–16, 37:7–10; Walsh-Steines Dep. 62:14–15.) It would drop deliveries off at Terminals 1, 3, 5, and 8 between 11:00 a.m. and 12:00 p.m. (Jairam Dep. 37:7–10.)

In 2012, the Assistant Manager at the Terminal 5 International store was Jairam; he had been working for the company for over a decade. (Jairam Dep. 12:7–9, 12:25–13:8.) Plaintiff worked at the Terminal 5 location. (*See id.* at 39:23–40:1.) According to Jairam, Hernandez had been hired as a "sales associate" with the additional responsibilities of "delivery guy." (*Id.* at

42:13–24.)

In addition to conducting orientation for new hires, Jairam supervised employees' execution of their job responsibilities. (*Id.* at 16:12–14, 46:17–23.) Jairam supervised approximately thirty-one employees, of which roughly twenty were sales associates. (*Id.* at 16:15–17, 16:24–17:1.) When deliveries for International would arrive at Terminal 5, the bulk-packaged merchandise would be unloaded into a storage area on the first floor of the terminal. (Jairam Dep. 28:12–17; Walsh-Steines Dep. 26:13–27:4.) Three of Jairam's employees were required to unload the truck when deliveries arrived. (Jairam Dep. 28:9–12.) It was their responsibility to take the grey bins, which usually numbered between twelve and fourteen, directly from the storage area to the store, which was located on the second floor of the terminal. (*Id.* at 30:22–31:3, 33:3–9.) A hand truck, operated by two employees, one in front and one in back, was generally used to transport the grey bins, as they could be "quite heavy," from their location in the storage area, to the elevator, and then to the store. (*Id.* at 30:1–16, 31:21, 33:4–6.) Additionally required was the unpacking of the boxes, an inventory count, and the appropriate shelving of the boxed merchandise in the storage area. (*Id.* at 28:16–17, 32:4–8.)

Throughout the day, on an "as needed" basis, Jairam would send salespersons downstairs to collect inventory necessary to replenish the store's shelves. (*Id.* at 35:21–36:18; Sueskind Dep. 70:12–15.) The employees were always sent to the storage room in pairs. (Jairam Dep. 30:4–8.) All retail sales associates, not just those designated to unload the merchandise off the delivery truck from Valley Stream, were required to retrieve inventory from the storage area when asked. (Sueskind Dep. 71:20–72:12.)

Due to Federal Aviation Administration regulations concerning the transportation of goods by air passengers, all International sales associates were required to deliver customers'

individual items to their respective gates.  (Hr'g Tr., Apr. 20, 2015 ("Hr'g Tr."); Jairam Dep.

24:9–12.)  The delivery of these packages would be performed by women as well as men.

(Jairam Dep. 24:7–12.)  Some items, such as large multi-liter containers of alcohol, could weigh

in excess of twenty-five pounds.  (Hr'g Tr.)  Purchasing activity of "heavy" items—which

dictated the frequency that these items would need to be delivered to airport gates—fluctuated.

(*Id.*)

## B.  Plaintiff Hernandez

### 1.  Education

Plaintiff Ramon Hernandez claims to have graduated from Continental Academy, a

Florida high school, in 2007.  (Dep. of Ramon Hernandez at 9:1–10, ECF No. 33-17

("Hernandez Dep.").)  At his deposition, he said he was born on March 17, 1979.  (*Id.* at 8:22–

23.)  Aside from a real estate diploma allegedly obtained in Long Island, he has no other

education; he never obtained a real estate license.  (*Id.* at 9:12–24.)

### 2.  Employment History

#### a.  International Shoppes:  2006–2009

While attending Continental Academy, plaintiff began working for International.  In his

amended complaint, he alleges that he was employed by the company "as a sales representative

from approximately 2006 until 2009."  (Am. Compl. ¶ 10, ECF No. 6 ("Am. Compl.")).  Alleged

is that, when he first worked for International, he was never required to lift any items.

(Hernandez Dep. 10:21–11:10.)  At his deposition, the following exchange took place:

> Q: . . .  What were your duties as a [sales representative]?
> A:  Sales.
>
> Q:  Okay. Anything else?
> . . .
> A: . . .  No, that's it.

```
Q:  How would you go about making sales?
A:  The customer arrived, okay, they asked for price, and I sold
    stuff to them.

Q:  So did you sell generally liquor.
A:  Liquors and tobacco.

Q:  Anything else?
A:  That's all.
```

(*Id.*)

Although, in his amended complaint, plaintiff states that he resigned from International in 2009 to transfer to a higher paying job (Am. Compl. ¶ 11), he changed his story at his deposition. When he was deposed, plaintiff said that he was fired from International for allegedly making an inappropriate comment to a colleague.  (*Id.* at 11:11–17.).  Plaintiff's official termination papers were not proffered to the court.

The documentary evidence attached to defendant's motion papers, however, indicates that while plaintiff was suspended in August 2007 for making an inappropriate comment to a coworker, he was not terminated as a result.  (*See* Suspension and Performance Review 1–3, ECF No. 33-8.)  The August 23, 2007 reprimand, which plaintiff signed, indicates that he received a one-day suspension on August 21, 2007 "for making an inappropriate comment during a conversation with a co-worker."  (*Id.* at 1.)  In fact, he was still working for defendant in September 2008 when he received a mostly unsatisfactory performance review.  (*Id.* at 2–3.)  On a scale of 1 to 3, with "1" being an "Unsatisfactory" rating, out of a total of twenty-five categories, plaintiff received twenty-one "1s."  (*Id.*)  The category labeled "Knowledge of job requirements" was marked with a "1."  (*Id.* at 2.)

### b. Solstice Sunglasses: Early 2009

While the exact timeline is unclear, at some point during his first employment with defendant, plaintiff obtained an afternoon job at JFK's Solstice Sunglasses ("Solstice"), making an hourly rate of $13. (Hernandez Dep. 66:3–67:1.) Approximately three months after being terminated from International, in or around April 2009, plaintiff claims that he voluntarily quit his job at Solstice. (*Id.* at 67:16–17; Am. Compl. ¶ 11.) His reason: "It was too much, both work, jobs, and I was really feeling it." (Hernandez Dep. 67:14–15.)

### c. NewsLink: 2009–2012

One week after leaving Solstice, around May 2009, Hernandez took a forty percent pay cut. (*Id.* at 15:2–16, 17:7–17:11, 68:2–5.) He started working at NewsLink, where he earned $8 per hour as a cashier. (*Id.* at 17:7–17:11.) When offered health insurance by NewsLink, he turned it down. (*Id.* at 19:9–21.)

Months later, offered the opportunity to earn $9 per hour, plaintiff agreed to become a NewsLink "delivery person," picking up deliveries from the basement and transporting them to the storefront. (*Id.* at 16:13–17:6, 17:15–17.)

Almost two years later, on April 4, 2011, plaintiff apparently injured his back while transporting thirty-eight cases of Coca-Cola on a hand truck. (Am. Compl. ¶ 12; Hernandez Dep. 68:19–69:4; Letter of Disability, June 29, 2012, ECF No. 33-7 ("Disability Letter").) Hernandez went to the emergency room at Jamaica Medical Hospital where his injury was treated. (Hernandez Dep. 69:11–20.) Three weeks later, on or around April 21, 2011, he saw a chiropractor, who told him that his back injury prevented him from lifting items weighing more than twenty pounds. (*Id.* at 69:25–70:23.) Because of his claimed back injury and its consequent limitations, plaintiff returned to his duties as a NewsLink cashier; his pay returned to

the hourly rate of $8.  (*Id.* at 21:7–10.)

Plaintiff was terminated from NewsLink in or around April 2012.  (*Id.* at 23:24–24:5.)

### d.  International Shoppes:  Mid 2012

According to plaintiff, he was re-hired by International prior to being terminated from NewsLink.  (*Id.* at 24:2–5.)  He claims that he reached out to Salazar about the possibility of working for the company again because it paid better than NewsLink.  (*Id.* at 27:17–21, 29:2–4.)

On April 10, 2011, Hernandez attended International's open house interview session in the Terminal 1 food court.  (*Id.* at 31:22–32:13.)  When he arrived, he met with Salazar, who ordered Dalipi to hire him.  (*Id.* at 32:14–33:1.)  At plaintiff's deposition, the story was told as follows:

> Q:  So you went to Terminal 1 and you saw [Salazar]; correct?
> A:  Exactly.
>
> Q:  Okay. And did you and she speak?
> A:  Yes.
>
> Q:  Okay. What was said?
> A:  I asked her, "Do you think I have the opportunity to work with you?"
>
> Q:  What did she say?
> A:  "Okay."
>
> Q:  Okay. And then what else was said?
> A:  And then she told Dalipi, "Give him the opportunity."
> . . .
>
> Q:  What if anything did Dalipi say in response?
> A:  "Okay."
>
> Q:  And what was said next, if anything?
> A:  And then he took me to his office.
> . . .
>
> Q:  Okay. So you got to Dalipi's office.  Did you have a conversation with him?

13

A: No.

Q: Okay. What happened in his office, if anything?
A: His assistant, okay, gave me the papers. He gave me the—he showed me the policy of the company and *he told me exactly what I have to do*.

. . .

Q: Okay. This Dalipi's assistant who gave you the paper's to fill out, did you have a conversation with him?
A: He's the one that explained the dress code, okay, that my hair has to be short, that I have to shave, and that's it.

Q: Nothing else.
A: That's it.

(*Id.* at 32:14–36:1 (emphasis added).)

According to plaintiff, he did not speak with Walsh-Steines about the job's lifting requirements. (*Id.* at 35:19–36:1; Hernandez Aff. ¶ 7, ECF No. 34-18.)

Q: Did you have any conversations about what your job duties were with anyone at International Shoppes?
A: *I already worked there before, so I knew exactly what to do*.

(Hernandez Dep. at 39:20–24 (emphasis added). *But see* Walsh–Steines Dep. 49:16–19 ("I remember specifically explaining to Mr. Hernandez and saying to him that this [*i.e.*, the 4:30 a.m. shift] would be a labor-intensive shift, meaning the first half of your shift would be doing deliveries.").)

Hernandez's employment application, signed and dated April 10, 2012, has several irregularities:

*First*, on the application where it asks "Are you under the age of 18?," Hernandez has marked "Yes," which even if he were born in 1989, not 1979 as he stated in his deposition, would be incorrect. (Employment Application 1, ECF No. 33-5 ("Employment App.").)

*Second*, although plaintiff marked "Yes" where the application asked, "Have you ever applied with International Shoppes before?," he never responded to the next question: "Have you ever been employed by International Shoppes before?" (*Id.*) Plaintiff has admitted in his complaint and deposition that he was an employee of International on a prior occasion. (Am. Compl. ¶ 10; Hernandez Dep. 9:25–10:3)

*Third*, under references, Hernandez lists a "Josef Hernandez," an apparent relative, but states that he has only known this person for five years. (Employment App. 1.)

*Fourth*, on the back of application, under employment history, Hernandez lists "Duty Free" located at JFK Airport as his former employer, an apparent reference to his prior position at International, but indicates that he was employed there from 2004 to 2007. (*Id.* at 2.) This contradicts the information he supplied in the amended complaint and his deposition. (Am. Compl. ¶ 10; Hernandez Dep. 10:4–7.)

*Fifth*, under educational history, Hernandez lists his high school as "New Town High School," next to which he has checked "Yes" in the column labeled "Currently Attending." (Employment App. 2.) This contradicts the information he supplied in his deposition. (Hernandez Dep. 9:1–7.)

To resolve the varieties of inconsistencies in plaintiff's contentions, the court ordered knowledgeable representatives of defendant and plaintiff in person to appear at the hearing on the motion for summary judgement. (*See* Docket Entry Mar. 25, 2015 ("Motion Hearing set for 4/20/2015 at 11:00 A.M. in Courtroom 10B South before Judge Jack B. Weinstein. The plaintiff and a knowledgeable person for the defendant shall be present in person with counsel at the hearing.").) Defendant's representatives with knowledge appeared and testified credibly and fully. (*See* Hr'g Tr. Apr. 20, 2015.) Plaintiff himself did not appear. (*Id.*)

### C. Plaintiff's Three-Week Employment at International

On or around June 13, 2012, plaintiff started work at International's storefront in Terminal 5. (Am. Compl. ¶ 18.) He was hired to work the 4:30 a.m. opening shift as a sales associate and a "delivery guy." (Walsh-Steines Dep. 49:7–13; Jairam Dep. 42:9–15.) This was a "labor-intensive" shift; it required transporting heavy inventory from the storage area to the store early in the morning, as well as assisting with the heavy deliveries from Valley Stream when they arrived. (Walsh-Steines Dep. 49:16–22; Jairam Dep. 37:20–38:17.)

Claimed is that on June 28, 2012 his supervisor asked him to carry eight cases of Johnny Walker Whiskey upstairs from the basement. (Am. Compl. ¶ 22.) When plaintiff informed Jairam of his impairment, he was told to provide a doctor's note. (*Id.* at ¶ 24; Jairam Dep. 45:6– 9.) On June 30, 2012, a doctor's note from N.Y. Empire Medical P.C., dated June 29, 2012, was provided. (Am. Compl. ¶ 26; Jairam Dep. 47:1–8; Disability Letter.) The doctor's note indicated that plaintiff could either work "part time" or "limited duty" and was restricted from "heavy lifting or repetitive lifting, more than 25 lbs. occasional, 20 lbs. frequent." (Disability Letter.) It noted that plaintiff's period of disability ran from April 4, 2011 through December 2012. (*Id.*)

Five days later, plaintiff's employment at International was terminated. (Am. Compl. ¶ 32; Supervisor: Employee Job Status Change Form, ECF No. 33-10.) A July 6, 2012 letter to plaintiff, signed by Sueskind, states:

> Dear Mr. Hernandez:
>
> Your employment with International Shoppes has been terminated effective July 5, 2012. You were terminated because you were unable to perform the essential functions of your position.
>
> Since you are not an active participant in the company's group health plan, you are not eligible to participate in the continuation of medical coverage under COBRA.

You are also not a participant in the company sponsored 401(k) plan.

Information regarding unemployment insurance eligibility may be found at www.labor.state.ny.us.

Your full and final paycheck for time worked through your termination date will be mailed to you at the close of the next payroll cycle.

If you have any questions, please feel free to call me.

Letter from Sueskind to Hernandez, July 6, 2012, ECF No. 33-9.

An email from Dalipi to Sueskind, dated July 6, 2012, memorializing a conversation

Dalipi had held with Hernandez on the day prior, states:

Spoke with Ramon and recited the following statement twice:

"Because we advised you during the interview process of the essential function requirement that you would be required to engage in the delivery process for this position, we are not required to accommodate your limitations because we were not made aware of them at the time of the interview."

I asked if he understood the statement above, he responded: "yes."

He became confused and could not understand the reason for termination. I read the statement for a 3x and then broke down each section of the statement. I advised him, in layman's terms, that because he was dishonest during this interview and [withheld] vital information that would have helped [International] find reasonable commendations for his back injury, for his own safety and the safety of others within our stores, we could no longer employ him.

He requested that we ignore his doctor's note and that he would be able to lift and fulfill all the functions of a sales associate. I repeated that I could not ignore the doctor's note.

He was silent for a few minutes and I requested the JFK ID badge back, he became [irate] and angry. He [abruptly] stood up 2x and I encouraged him to relax and think about his future and making the right choices. He was able to calm down and requested for his job again. I told him we have to stand by our decision for his safety

> and [International's]. He became [irate] again and stated that we
> were discriminating again him. I asked him in what way we were
> being [discriminatory]. He fell silent once more. I advised that
> [International] a wide diverse employee demographics [*sic*] and
> that this decision was not an easy one.
>
> I advised him that he must call me within 7 business days to
> receive paper work to remove [International] from his JFK ID. At
> this point, [Jairam], store manager, and myself escorted him to the
> exit of the security check point.

(Email from Dalipi to Sueskind, July 6, 2012, ECF No. 33-11.)

Plaintiff alleges that he suffered "mental anguish and humiliation" due to his termination

from International, including the inability to eat, to sleep, to pay rent, and to maintain a

relationship with his girlfriend, who was dependent on his income. (Hernandez Dep. 82:10–

83:13.) He stated:

> [Because] I lost the job . . . I had no money to pay the rent or to
> eat. . . . I was living alone and I had to go back to living with my
> parents. I was not able to sleep at night. I was feeling so bad that I
> was sleeping on the floor because [there was] only one bed [at my
> parent's house] and that belongs to my father. . . .
>
> I lost my job. And then after that, all the problems came in. I lost
> my house, I lost everything. . . . At the time, my partner left me
> because I had no money to help her. . . . I was extremely
> depressed. I was not able to sleep at all and I was feeling very bad.
> . . . I had no money. I had lost everything.

(*Id.*)

### D. EEOC Complaint

Plaintiff filed a complaint with the EEOC on or around April 19, 2013. (Am. Compl.

¶ 4.) The EEOC complaint alleged violations sufficiently similar to those that appear in the

amended complaint. (*Id.*) A right-to-sue letter was issued on or around September 2013. (*Id.*)

Plaintiff filed his action in this court on November 27, 2013. (Compl. 12, ECF No. 1.) The

action commenced prior to the ninety-day limitations period applicable to the EEOC right-to-sue

notice.  (Am. Compl. ¶ 4.)

### III.  Standard

Summary judgment shall be granted where the movant shows that there is "no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Federal Rule of Civil Procedure Rule 56(c) explains:

> A party asserting that a fact cannot be or is genuinely disputed
> must support the assertion by:
>
> > (A) citing to particular parts of materials in the record,
> > including depositions, documents, . . . affidavits or
> > declarations . . . admissions, [or] interrogatory answers; or
> >
> > (B) showing that the materials cited do not establish the
> > absence or presence of a genuine dispute[.]

*Id.*

When ruling on a summary judgment motion, the district court must construe the facts in

the light most favorable to the non-moving party, resolving all ambiguities and drawing all

reasonable inferences against the movant.  *See Capobianco v. City of N.Y.*, 422 F.3d 47, 54–55

(2d Cir. 2005) (holding that mere presence of medical condition or impairment does not

necessarily establish disability under ADA).  "Summary judgment is appropriate . . . where the

record as a whole indicates that no rational factfinder could find in favor of the non-moving

party."  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (citations

and internal quotation marks omitted) (summary judgment denied where issues of material fact

existed regarding the provision of reasonable accommodation).

An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of

fact." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) (internal quotation marks and citation omitted) (affirming summary judgment where depositions of three doctors as to former city bus driver plaintiff's color blindness, and resulting inability to distinguish traffic lights, meant that there was no material question of fact as to whether plaintiff was "otherwise qualified" for his position as required by ADA). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Courts must be "guided by the substantive evidentiary standards that apply to the case" in determining whether a factual dispute warrants submission to a jury. *Id.* at 255.

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (per curiam) (quoting *Anderson*, 477 U.S. at 248). A question of material fact does not exist merely because plaintiff disagrees with the deposition testimony and documentary evidence produced by defendant. *See Anderson*, 477 U.S. at 247–48 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." (emphasis in original)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). The court's goal should be to "isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

The non-moving party is not "relieved of his own burden of producing . . . evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. A non-movant must set forth affirmative evidence in order to defeat a summary judgment motion. *Id.* at 257. Credibility

issues are not created simply because plaintiff points the finger at multiple opposing witnesses and documents and, without providing any further documentary or testimonial evidence, brushes them off as lies. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (explaining that it is the role of the court to cautiously "distinguish between evidence that allows for a reasonable inference" and that which "gives rise to mere speculation and conjecture" (internal quotation marks and citations omitted)).

In considering affirmative evidence, courts will consider the "strength of the [non-movant's] prima facie case" and "probative value of proof that the [movant's] evidence is false." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49, 150 (2000) (internal quotation marks and citation omitted) (reversing judgment as a matter of law, stating "the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same"). "[D]iscredited testimony is not normally considered a sufficient basis" for the denial of summary judgment. *Anderson*, 477 U.S. at 256–57 (internal quotation marks and citation omitted). *See also Jeffreys v. City of N.Y.*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming summary judgment where there was "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony").

## IV. Law

### A. Statutes

#### 1. American Disabilities Act

##### a. Dialogue Between Congress and Supreme Court

Congress originally enacted the ADA in 1990. *See* Pub. L. No. 101-336, 104 Stat. 327 (codified at 42 U.S.C. § 12101, *et seq.*). The stated purpose of the statute was:

(1)    to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2)    to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3)    to ensure that the Federal Government plays a central role in enforcing the standards established in this Act on behalf of individuals with disabilities; and

(4)    to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

*Id.* at § 2(b).

Early on, decisions by the Supreme Court narrowed the scope of the terms of the Act, making it difficult for putative plaintiffs to bring claims under the ADA. *See, e.g.*, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999) (corrective measures taken by plaintiffs to mitigate physical and mental impairments "must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the [ADA]"); *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197–98 (2002) (finding that the "terms [of the ADA] need to be interpreted strictly to create a demanding standard for qualifying [an individual] as disabled" and holding that a physical impairment must be "permanent or long term" in order to be considered a "substantial limitation" under the statute (internal citations omitted)).

In response, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"). Pub. L No. 110-325, 122 Stat. 3555, (codified at 42 U.S.C. §§ 12102(1)–(2)). Repudiating Supreme Court decisions, the Act states:

> [As] a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities; . . . in particular, the Supreme Court . . . interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress.

*Id.* at § 2(6)–(7).

The amendment changed the ADA in several significant ways. It, for example:

- directed the EEOC to revise that portion of its regulations defining the term "substantially limits";

- expanded the definition of "major life activities" by including two non-exhaustive lists:

  the first list includes many activities that the EEOC has recognized (*e.g.*, walking) as well as activities that the EEOC has not specifically recognized (*e.g.*, reading, bending, and communicating);

  the second list includes major bodily functions (*e.g.*, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions")
  . . .

- changed the definition of "regarded as" so that it no longer requires a showing that the employer perceived the individual to be substantially limited in a major life activity, and instead says that an applicant or employee is "regarded as" disabled if he or she is subject to an action prohibited by the ADA (*e.g.*, failure to hire or termination) based on an impairment that is not transitory and minor.

*Notice Concerning The Americans With Disabilities Act (ADA) Amendments Act of 2008*, U.S. Equal Employment Opportunity Commission, *available at* http://www.eeoc.gov/laws/statutes/ adaaa_notice.cfm (last visited Apr. 21, 2015). In short, "[t]he effect of these changes [wa]s to make it easier for an individual seeking protection under the ADA to establish that he or she has a disability within the meaning of the [statute]." *Id.*

**b.** **Text**

**i. Discrimination**

The ADA makes it unlawful for employers to discriminate against employees on account

of a disability.  It states in relevant part:

> No covered entity shall discriminate against a qualified individual
> on the basis of disability in regard to job application procedures,
> the hiring, advancement, or discharge of employees, employee
> compensation, job training, and other terms, conditions, and
> privileges of employment.

42 USC § 12112(a).

A disability is defined as follows:

> (A) a physical or mental impairment that substantially limits one
> or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment . . . .

*Id* at § 12102(1).  "The definition of disability in [the ADA] shall be construed in favor of broad

coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the

ADA."  *Id.* at § 12102(4)(A).

A qualified individual under the ADA is defined as:

> *[A]n individual who*, with or without reasonable accommodation,
> *can perform the essential functions of the employment position* that
> such individual holds or desires.  For the purposes of [the statute],
> *consideration shall be given to the employer's judgment as to what
> functions of a job are essential*, and if an employer has prepared a
> written description before advertising or interviewing applicants
> for the job, this description shall be considered evidence of the
> essential functions of the job.

*Id.* at § 12111(8) (emphasis added).

### ii. "Regarded as" Disabled

Where an individual has failed to plead an actual disability or record of a disability, she may make a case that she was "regarded as" disabled under the ADA. *See Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 605 (E.D.N.Y. 2013) ("A plaintiff who is 'regarded as' disabled is protected under the ADA even if she is not actually disabled." (citation and internal quotation marks omitted)) (finding that plaintiff adequately alleged that she was "regarded as" disabled, but granting summary judgment on ground that plaintiff does not allege that she was otherwise qualified for the position). An individual is held to be "regarded as" having a disability if he or she is subject to conduct that is unlawful under the ADA, regardless of whether the disability is actual or merely perceived. The statute explains:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A). An individual cannot be regarded as disabled under the ADA where the impairment is transitory and minor. *Id.* at § 12102(3)(B). A transitory impairment is defined as "an impairment with an actual or expected duration of [six] months or less." *Id.*

### iii. Failure to Accommodate

Discrimination under the ADA can occur when an employer refuses to reasonably accommodate an employee's disability. The term "discriminate against a qualified individual on the basis of disability" includes:

> *not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, *unless such covered entity can demonstrate that the accommodation would impose an undue hardship* on the operation of the business of such covered entity. . . .

*Id.* at § 12112(b)(5)(A) (emphasis added).

"[R]easonable accommodation" may involve:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id* at § 12111(9).

Employers do not need to reasonably accommodate individuals who do not have an actual disability. *Id.* at § 12201(h); *see also*, *Morris v. Town of Islip*, No. 12-cv-2984, 2014 WL 4700227, at *10 (E.D.N.Y. Sept. 22, 2014) ("the 'regarded as' theory of disability is no longer actionable in the context of a failure to accommodate claim" (internal quotation marks and citation omitted)); *Powers v. USF Holland, Inc.,* 667 F.3d 815, 823 n.7 (7th Cir. 2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation.'" (citing 42 U.S.C. § 12201(h))).

"Undue hardship" is defined as: "[A]n action requiring significant difficulty or expense . . . ." *Id.* at §12111(10)(A). The factors taken into account when determining whether a reasonable accommodation would put an undue hardship on a business include:

> (i) the nature and cost of the accommodation needed under this chapter;

> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

*Id.* at §12111(10)(B).

### iv.      Retaliation

Retaliation against individuals pursuing their rights under the ADA is prohibited.

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA].

*Id* at § 12203(a).

### 2.      New York State Human Rights Law

Under NYSHRL, it is unlawful for an employer to discharge or discriminate against an individual because of a disability. The statute states:

It shall be an unlawful discriminatory practice . . . [f]or an employer . . . , because of an individual's . . . disability, . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1)(a).

Disability is defined as:

(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques; or (b) a record of such an impairment; or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with

employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

*Id.* at § 292(21).

NYSHRL requires employers to reasonably accommodate disabled employees unless such an accommodation would impose an "undue hardship" on the business.

It shall be an unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to the known disabilities of an employee . . . .

Nothing contained in this subdivision shall be construed to require provision of accommodations which can be demonstrated to impose an undue hardship on the operation of an employer's . . . business, program or enterprise.

*Id.* at § 296(3)(a)–(b).

Reasonable accommodation is defined as:

[A]ctions taken which permit an employee . . . with a disability to *perform in a reasonable manner the activities involved in the job or occupation sought* or held and include, but are not limited to, provision of an accessible worksite, acquisition or modification of equipment, support services for persons with impaired hearing or vision, job restructuring and modified work schedules; *provided, however, that such actions do not impose an undue hardship on the business* . . . from which action is requested.

*Id.* at § 292(21-e) (emphasis added).

NYSHRL does not make use of the "essential functions" language present in the ADA, but "the inquiry into whether plaintiff can *perform in a reasonable manner the activities involved in the job sought* under the NYSHRL is the same as the inquiry into whether plaintiff is qualified to perform the essential functions of the job sought under the ADA." *Russo v. Sysco Food Serv. of Albany, L.L.C.*, 488 228, 238 (N.D.N.Y. 2007) (emphasis added). *See also, e.g., Vinkokur v. Sovereign Bank*, 701 F. Supp. 2d 276, 293 (E.D.N.Y. 2010) ("[t]o establish a prima facie failure

to accommodate claim under the [NYSHRL] . . . a plaintiff must demonstrate that . . . she was otherwise qualified to perform the essential functions of her job with reasonable accommodation" (emphasis added)).

"[U]ndue hardship" is defined as a "significant difficulty or expense to the employer." 9 N.Y.C.R.R. § 466.11(b)(2). Factors to be taken into account when determining if a reasonable accommodation imposes an undue hardship include:

> (i) The overall size of the business . . . with respect to the number of employees, number and type of facilities, and size of budget;
>
> (ii) The type of operation which the business, program or enterprise is engaged in, including the composition and structure of the workforce; and
>
> (iii) The nature and cost of the accommodation needed.

N.Y. Exec. Law § 296(3)(b).

Retaliation is prohibited.

> It shall be an unlawful discriminatory practice . . . [f]or any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

N.Y. Exec. Law § 296(1)(e).

### 3. New York City Human Rights Law

NYCHRL makes it unlawful for an employer to discharge or discriminate against an individual because of a disability. It states:

> It shall be an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived . . . disability . . . status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8–107(1)(a).

Disability is defined under the NYCHRL as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." *Id* at § 8–102(16)(a). "Impairments" include, but are not limited to:

> [problems associated with] the neurological system; the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system . . . .

*Id* at § 8–102(16)(b)(1).

This definition of disability is, on its face, broader than that provided by NYSHRL. The Court of Appeals for the Second Circuit has explained:

> New York State courts have noted that, under the Local Civil Rights Restoration Act of 2005, Local Law No. 85 of the City of New York, analysis of NYCHRL provisions must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's uniquely broad and remedial purposes, which go beyond those of counterpart State or federal civil rights laws. In short, the text and legislative history represent a desire that the City HRL meld the broadest vision of social justice with the strongest law enforcement deterrent.

*Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) (internal quotation marks and citations omitted) (remanding case to district court to determine whether plaintiffs' obesity is a disability that would satisfy the prima facie case for employment discrimination under NYCHRL, noting that the district court "may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice [for] refiling in state court"). "The definition of disability under the NYCHRL, which includes 'any physical, medical, mental or psychological impairment,' is broader than the definition of disability in the

ADA." *Harris v. NYU Langone Med. Ctr.*, No. 12-cv-0454, 2013 WL 3487032, at *26

(S.D.N.Y. July 9, 2013), *report and recommendation adopted as modified*, 2013 WL 5425336

(S.D.N.Y. Sept. 27, 2013) (denying defendant's motion to dismiss plaintiff's claim for

termination based on disability where "[plaintiff] has alleged sufficient facts to establish a claim

of disability discrimination" under NYCHRL).

NYCHRL mandates that employers provide reasonable accommodations to disabled

employees, so long as the employee can still satisfy the "essential requisites" of the position.

> [A]ny person prohibited by the provisions of this section from
> discriminating on the basis of disability shall make reasonable
> accommodation to enable a person with a disability to satisfy the
> essential requisites of a job or enjoy the right or rights in question
> provided that the disability is known or should have been known
> by the covered entity.
>
> In any case where the need for reasonable accommodation is
> placed in issue, it shall be an affirmative defense that the person
> aggrieved by the alleged discriminatory practice could not, with
> reasonable accommodation, satisfy the essential requisites of the
> job . . . .

*Id* at § 8–107(15)(a)–(b).

Reasonable accommodation is defined as:

> [S]uch accommodation that can be made that shall not cause undue
> hardship in the conduct of the covered entity's business.

*Id* at § 8–102(18). Factors to be taken into account when determining if a reasonable

accommodation imposes an undue hardship include, but are not limited to:

> (a)   the nature and cost of the accommodation;
>
> (b)   the overall financial resources of the facility or the facilities
>       involved in the provision of the reasonable accommodation; the
>       number of persons employed at such facility; the effect on
>       expenses and resources, or the impact otherwise of such
>       accommodation upon the operation of the facility;

(c) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees, the number, type, and location of its facilities; and

(d) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

*Id* at § 8–102(18).

The Administrative Code of the City of New York does not define "essential requisite," but courts considering the issue have held that it is equivalent to the term "essential function" prevalent in the ADA. *Shannon*, 332 F.3d at 103–04. *See also Sweet v. Elec. Data Sys.*, No. 95-cv-3987, 1996 WL 204471, at *10 (S.D.N.Y. Apr. 26, 1996) ("Although 'essential requisites' technically differs from 'essential functions,' there is no reason to believe that the two phrases differ meaningfully.") (applying ADA and NYCHRL).

Retaliation is prohibited.

It shall be an unlawful discriminatory practice for any [employer] to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter . . . . The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment . . . provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

*Id* at § 8–107(7).

### B. Disability Discrimination

#### 1. Law

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*," 411 U.S. 792 (1973). *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013) (internal quotation marks omitted) (applying framework and denying summary judgment where there was material issue of fact regarding whether timeliness in the morning was an "essential function" of schizophrenic plaintiff's employment and whether reasonable accommodation was available); *see also McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009) (applying framework and finding that employee who worked with various chemical fumes failed to show that there was a reasonable accommodation of her respiratory ailment that employer could have pursued beyond its offer to provide her with a respirator that would deliver breathable air during working hours, which she rejected).

The Court of Appeals for the Second Circuit has described the *McDonnell Douglas* framework as follows:

> Under *McDonnell Douglas*, plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. . . . The burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action. Plaintiff then must show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.

*Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Prog., Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal quotation marks and citations omitted) (summary

judgment denied where, applying *McDonnell Douglas* burden shifting to an ADA discrimination claim, plaintiff suffering from lymphoma made prima facie case that his employers regarded him as impaired).  In essence, (1) "[a] plaintiff must establish a prima facie case;" (2) "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge;" and (3) "the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *McBride*, 583 F.3d at 96 (internal quotation marks and citation omitted).

"In discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment."  *McMillan*, 711 F.3d at 126 (internal quotation marks and citation omitted).

The Court of Appeals for the Second Circuit has determined that "a plaintiff's [disability] discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII."  *Spiegel*, 604 F.3d at 80 (summary judgment affirmed in part where there was no material issue of fact as to whether plaintiff's obesity rendered him disabled under NYSHRL, but vacated and remanded in part to determine if obesity is a disability under NYCHRL).  *See also Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006) (finding NYSHRL disability discrimination claim "is governed by the same legal standards as govern federal ADA claims" and dismissing NYSHRL claim "on the same basis" as plaintiff's ADA claim).

"[B]ecause the law of New York in regard to relative state and federal disability claim analysis is still developing," the Court of Appeals for the Second Circuit has recommended that where there is an "absence of any continuing basis for federal question jurisdiction [under the

ADA]," "the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York." *Brief v. Albert Einstein Coll. of Med.*, 423 F. App'x 88, 93 (2d Cir. 2011) (internal quotation marks and citation omitted) (vacating district court's ruling with respect to State and City law disability claims and remanding with instruction that the district court dismiss the claims without prejudice so the parties could pursue the claims in New York State court); *Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001) (same). *See also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) ("[C]laims under [NYCHRL] must be reviewed independently from and 'more liberally' than their federal and state counterparts."); *Anderson v. Nat'l Grid, PLC*, No. 12–cv–4422, 2015 WL 1323977, at *2 (E.D.N.Y. Mar. 25, 2015) (granting summary judgment as to ADA claims but declining to exercise supplemental jurisdiction over NYSHRL claims). *See also Phillips v. City of N.Y.*, 884 N.Y.S.2d 369, 373 (N.Y. App. Div. 1st Dep't 2009) ("[NYSHRL] provides protections broader than the [ADA], and [NYCHRL] is broader still." (internal citation and footnote omitted)), *overruled on other grounds by Jacobsen v. N.Y.C. Health and Hosp. Corp.*, 11 N.E.3d 159 (N.Y. 2014).

### a. Prima Facie Case

To establish a prima facie ADA discrimination claim, a plaintiff must show that:

> (1) his employer is subject to the ADA;
> (2) he was disabled within the meaning of the ADA;
> (3) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and
> (4) he suffered an adverse employment action because of his disability.

*McMillan*, 711 F.3d at 125 (internal quotation marks and citation omitted). *See also Anderson*, 2015 WL 1323977, at *7–8 (same); *Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 572–73 (S.D.N.Y.

2014) (same). Establishing a prima facie case "is not a demanding burden." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). "Courts—not juries—should determine whether the initial *McDonnell Douglas* burdens of production have been met." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 130 n.6 (2d Cir. 2012) (quoting *Greenway*, 143 F.3d at 53). Once the burden is met, the plaintiff "creates a presumption that the employer discriminated against [him or her] in an unlawful manner." *Greenway*, 143 F.3d at 52.

### i. Applicability of ADA to Employer

An employer is subject to the ADA when it has "[fifteen] or more employees for each working day in each of [twenty] or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5). *See also Idlisan v. Mount Sinai Med. Ctr.*, No. 12-cv-8935, 2015 WL 136012, at *16 (S.D.N.Y. Jan. 9, 2015) (finding that defendant is subject to the ADA where defendant has "20,000 employees working throughout the year").

### ii. Three-Step Test Used To Determine Whether Disability Exists

The Court of Appeals for the Second Circuit has held that district courts should apply the three-step approach taken by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624 (1998), to determine whether a plaintiff is disabled. *See Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002); *Jeffries v. Verizon*, No. 10-cv-2686, 2012 WL 4344197, at *10 (E.D.N.Y. Aug. 31, 2012) ("[In] analyzing whether an individual has a disability, courts follow the three-step analysis set forth by the Supreme Court."), *report and recommendation adopted*, 2012 WL 4344188 (E.D.N.Y. Sept. 21, 2012). Under this analysis:

> [The] plaintiff must first show that []he suffers from a physical or mental impairment. Second, [he] must identify the activity claimed to be impaired and establish that it constitutes a major life activity. Third, the plaintiff must show that h[is] impairment substantially limits the major life activity previously identified.

*Id.* (internal quotation marks and citations omitted). The regulations put forward by the Equal Employment Opportunity Commission ("EEOC") "are entitled to great deference in interpreting the ADA." *Muller v. Costello*, 187 F.3d 298, 312 (2d Cir. 1999). *See also Giordano*, 274 F.3d at 747 ("Because the [EEOC] is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing the ADA's terms."); *McDonald v. City of N.Y.*, 786 F. Supp. 2d 588, 606 (E.D.N.Y. 2011) ("[The] law of this Circuit holds that the regulations interpreting the term 'disability' by the Equal Employment Opportunity Commission . . . are entitled to great deference." (internal quotation marks omitted)).

### a) Impairment

In order for a plaintiff to show that he suffered from an impairment, he must demonstrate that the alleged impairment fits within the EEOC's regulations defining physical and mental impairments. *See, e.g.*, *Anderson*, 2015 WL 1323977, at *9 (finding that plaintiffs uncontested evidence of his chronic back pain condition fits the EEOC's definition of a physical impairment).

Impairments are defined by the EEOC as:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

> (2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

### b) Major Life Activity

"[M]ajor life activities" are "activities that are of central importance to daily life."

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by statute*, ADA

Amendments Act of 2008, Pub. L No. 110-325, 122 Stat. 3555, (codified at 42 U.S.C. §§

12102(1)–(2)).  EEOC regulations define "major life activities" as including, for example:

> Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and
>
> The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions.  The operation of a major bodily function includes the operation of an individual organ within a body system.

29 C.F.R. § 1630.2(i)(1).  EEOC regulations further provide:

> In determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. . . . Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life."

*Id.* at § 1630.2(i)(2).

### c) Substantial Limitation

According to the regulations promulgated by the EEOC in response to the ADAAA,

courts are to interpret the term "substantially limited" in a broad fashion:

> The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.  *"Substantially limits" is not meant to be a demanding standard.*

An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

*The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.*

The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

*The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.*
. . .

The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

*Id.* at § 1630.2(j)(i)–(v), (ix) (emphasis added).

The Supreme Court recently noted the changes the ADAAA wrought in determining who is disabled under the ADA:

In 2008, Congress expanded the definition of "disability" under the ADA to make clear that "physical or mental impairment[s] that substantially limi[t]" an individual's ability to lift, stand, or bend are ADA-covered disabilities. As interpreted by the EEOC, the new statutory definition requires employers to accommodate

> employees whose temporary lifting restrictions originate off the job. We express no view on these statutory and regulatory changes.

*Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1348 (2015) (internal citations omitted).

"For an impairment to substantially limit the major life activity of working, it must render the individual significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Krachenfels v. North Shore Long Island Jewish Health Sys.*, No. 13-cv-243, 2014 WL 3867560, at *14 (E.D.N.Y. July 29, 2014) (applying ADA as amended by ADAAA and granting summary judgment where plaintiff cannot demonstrate how skin condition was an impairment that substantially limited a major life activity) (collecting cases).

Every physical and mental impairment is not considered a disability under the ADA. 29 C.F.R. § 1630.2(j)(1)(ii) ("[N]ot every impairment will constitute a disability within the meaning of [the ADA]. . . ."). *See also Anderson*, 2015 WL 1323977, at *1 (finding on motion for summary judgment that there was "no evidence" that "plaintiff's spondylolisthesis," a condition that causes back pain, "substantially limited his ability to perform the major life activities of sitting or working"); *Morris*, 2014 WL 4700227, at *10–11 (granting summary judgment where plaintiff's allegations that his shoulder injury impaired his ability to lift, despite medical evidence showing that he had no limitations on such activity, did not raise sufficient issue of fact as to how plaintiff's impairment substantially limited a major life activity); *Graham v. Three Village Cent. Sch. Dist.*, No. 11–cv–5182, 2013 WL 5445736, at *14 (E.D.N.Y. Sept. 30. 2013) (granting summary judgment where "plaintiff's own testimony confirms that her alleged physical impairment did not substantially limit the asserted major life activities of walking, standing, bending, lifting, or performing manual tasks").

Non-severe impairments that last only for a short period of time are not necessarily covered under the ADA:

> It may be a defense to a charge of discrimination by an individual claiming coverage under the "regarded as" prong of the definition of disability that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) "transitory and minor." To establish this defense, [an employer] must demonstrate that the impairment is both "transitory" and "minor." Whether the impairment at issue is or would be "transitory and minor" is to be determined objectively. [An employer] may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor. For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

29 C.F.R. §1630.15(f). *See, e.g.*, *Shaughnessy v. Xerox Corp.*, No. 12-cv-6158, 2015 WL 1431687, at *4 (W.D.N.Y. Mar. 27, 2015) (finding that plaintiff's sprained ankle does not constitute a disability where "there is no evidence suggesting that the injury was, or was ever thought to be, a long-term condition"); *Martinez v. N.Y. State Div. of Human Rights*, No. 1:13-cv-1252, 2015 WL 437399, at *7 (S.D.N.Y. Feb. 2, 2015) ("While, as plaintiff correctly points out, the ADA Amendments Act of 2008 . . . broadened the definition of a disability under the law, not all impairments are sufficiently substantial to be considered disabilities under the ADA . . . ."); *Mastrio v. Eurest Servs., Inc.*, No. 3:13–cv–00564, 2014 WL 840229, at *4 (D. Conn. Mar. 4, 2014) (noting that "even under the broadest definition of disability, short term or temporary impairments generally do still not render a person disabled within the meaning of the statute"); *Green v. DDG Properties, Co.*, No. 3:11-cv-01989, 2013 WL 395484, at*10 (D. Conn. Jan. 31, 2013) ("It appears that even under the ADAAA's broadened definition of disability, short term impairments would still not render a person disabled within the meaning of the

statute."). *See also* Margaret C. Jasper, Legal Almanac: The Americans With Disabilities Act § 2.5 (2012) ("[A]n individual with epilepsy, paralysis, HIV infection, AIDS, a substantial hearing or visual impairment, mental retardation, or a specific learning disability is covered, but an individual with a minor, non-chronic condition of short duration, such as a sprain, broken limb, or the flu, generally would not be covered. For example, an employee suffers a broken wrist that is expected to heal, but while it is healing he is unable to perform the essential functions of his job as an assembly-line worker. This employee is not protected by the ADA because, although he is "impaired," the impairment does not substantially limit a major life activity because it is of limited duration and will have no long-term effect."). *But see Vale v. Great Neck Water Pollution Control Dist.*, No. 14–cv–4229, 2015 WL 248603, at *7–8 (E.D.N.Y. Jan. 20, 2015) (applying ADA as amended by ADAAA and denying motion to dismiss where plaintiff broke her wrist and wore a brace for approximately a year).

If an individual sufficiently alleges an "actual" disability under the ADA, then it is not necessary for that person to prove that they were "regarded as" disabled as well in order to satisfy the second element of the prima facie case. *See, e.g.*, *Roggenbach v. Touro Coll. of Osteopathic Med.*, 7 F. Supp. 3d 338, 344 (S.D.N.Y. 2014) (finding that although plaintiff cannot show that he was "regarded as" disabled, plaintiff's HIV-positive status renders him disabled under the ADA).

### iii. Plaintiff Otherwise Qualified to Perform Essential Functions of Job

"Essential functions are defined under EEOC regulations to mean the fundamental duties to be performed in the position in question, but not functions that are merely marginal." *Shannon*, 332 F.3d at 100 (internal quotation marks and citations omitted) (holding that an employer's judgment with respect to which job functions are essential is to be afforded

considerable deference and weight); 29 C.F.R. § 1630.2(n)(1) ("[Essential functions are] the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position.")

*See also Hunt-Watts v. Nassau Health Care Corp.*, No. 12-cv-1815, 2014 WL 4185149, at *6 (E.D.N.Y. Aug. 21, 2014), *appeal filed*, No. 14-3608 (2d Cir. Sept. 19, 2014).

The Court of Appeals for the Second Circuit explained:

> Although a court will give considerable deference to an employer's determination as to what functions are essential, there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions[,] . . . includ[ing] the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions. . . . Usually, no one listed factor will be dispositive. A court must avoid deciding cases based on unthinking reliance on intuition about the methods by which jobs are to be performed. Instead, a court must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.

*McMillan*, 711 F.3d at 126 (internal quotations marks and citations omitted).

While a reasonable accommodation may include adjustments such as the modification of physical facilities, work schedules or equipment or job restructuring, reasonable accommodation does not mean the elimination of any of the position's essential functions. *See Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991); *Pabon v. N.Y.C. Transit Auth.*, 703 F. Supp. 2d 188, 196 (E.D.N.Y. 2010) (same); *see also Shannon*, 332 F.3d at 100 ("A reasonable accommodation can never involve the elimination of an essential function of a job.").

ADA regulations provide:

> A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i)   The function may be essential because the reason the position exists is to perform that function;
>
> (ii)  The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

> Evidence of whether a particular function is essential includes, but is not limited to:
>
> (i)    The employer's judgment as to which functions are essential;
>
> (ii)   Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii)  The amount of time spent on the job performing the function;
>
> (iv)   The consequences of not requiring the incumbent to perform the function;
>
> (v)    The terms of a collective bargaining agreement;
>
> (vi)   The work experience of past incumbents in the job; and/or
>
> (vii)  The current work experience of incumbents in similar jobs

29 C.F.R. § 1630.2(n)(3).

Whether a given work obligation is an essential function is fact intensive. No one factor is dispositive. *See Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) ("Usually no one listed factor will be dispositive, and the regulations themselves state that the evidentiary examples provided are not meant to be exhaustive."); *Hunt-Watts*, 43 F. Supp. 3d. at 127 (same).

After the essential functions of the position are determined, the plaintiff must demonstrate that:

> [H]e or she could have performed these functions, with or without reasonable accommodation, at the time of the termination or discipline. This burden is not heavy: It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Reasonable accommodations may include adjustments to work schedules or other job restructuring. Of course, a reasonable accommodation can never involve the elimination of an essential function of a job.

*McMillan*, 711 F.3d at 127 (internal quotations marks and citations omitted).

"If a plaintiff suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable." *Id.* at 128. An "undue hardship" is "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A).

An employer must engage in an "interactive process" with an employee to find a suitable reasonable accommodation. *Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 7 (2d Cir. 2014) (citing *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir.2000)). *See also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.") "A plaintiff alleging that he was denied a reasonable accommodation bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to meet the essential eligibility requirements of the service, program, or activity at issue." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012). "[A]n employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at

the time of his dismissal." *Id. See also Snowden v. Trustees of Columbia Univ.*, No. 14-1362-cv, 2015 WL 1727068, at *2 (2d Cir. Apr. 16, 2015) (denying plaintiff's claim that defendant did not "engage in a good-faith interactive process to determine whether any reasonable accommodations existed" where "[plaintiff] failed to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of her job"); *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 140 (2d Cir. 1995) (observing that an employer is not required to accommodate an individual with a disability by eliminating essential job functions, and that "having someone else do part of a job may sometimes mean eliminating the essential functions of the job").

### iv. Adverse Employment Action Taken

A plaintiff suffers an "adverse employment action" under the ADA when he or she endures a "materially adverse change in the terms, privileges, duration and conditions of employment." *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (internal quotation marks omitted) (denying summary judgment on plaintiff's retaliation claim where there were material issues of fact as to pretext regarding defendant's passing over of plaintiff for promotion multiple times). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities. . . ." *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir. 2004) (internal quotation marks and citation omitted) (finding that plaintiff had sufficiently alleged two materially adverse employment actions: being assigned a disproportionately increased workload and termination).

### b. Business Reason Proffered for Termination

Once a prima facie case has been established, "the defendant must produce evidence" which supports a "clear and specific" explanation for the termination, and which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (internal quotation marks omitted) (finding that defendant's assertions that termination was due to declining sales and dissatisfaction with plaintiff's job performance sufficiently rebutted presumption of discrimination); *see also Avella v. Valley Cent. Sch. Dist.*, No. 09-cv-923, 2011 WL 6338805, at *7 (S.D.N.Y. Dec. 19, 2011). "If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Spiegel*, 604 F.3d at 80 (alterations and internal quotation marks omitted).

"Federal courts do not have a 'roving commission to review business judgments,' and may not 'sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions.'" *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 156 (E.D.N.Y. 2013) (internal quotation marks and citations omitted), *aff'd*, 576 Fed. App'x 39 (2d Cir. 2014). "Typically, it is not for courts to second-guess the quality or wisdom of the reason, so long as it is not unlawfully discriminatory." *Macshane v. City of N.Y.*, No. 05-cv-06021, 2015 WL 1298423, at *11 (E.D.N.Y. Mar. 23, 2015) (citation omitted). *See also Pisana v. Merrill Lynch & Co., Inc.*, 1995 WL 438715, at *4 (S.D.N.Y. July 24, 1995) ("Employers are free to terminate employees for subjective business judgments so long as their actions are not taken for discriminatory reasons." (citation omitted)).

### c. Whether Proffered Business Reason Is Pretextual

At the last stage of the *McDonnell Douglas* test, a plaintiff "must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [disability] was the real reason for the discharge." *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996); *see also Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (holding that a plaintiff "must show, using evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason, that the defendant's proffered reason was pretextual" (internal quotation marks and citations omitted)). "The plaintiff retains the ultimate burden of persuasion," but "[s]ummary judgment is appropriate only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Id.* at 314 (alterations and internal quotation marks omitted).

### 2. Application

### a. Prima Facie Case

Plaintiff arguably satisfies three of the four elements necessary to establish a prima facie ADA discrimination claim, but fails to satisfy the fourth element of the test:

*First*, the parties do not dispute that International is subject to the ADA. *See supra* Parts II.A.3 & IV.B.1.a.i.

*Second*, based on the documents before the court, plaintiff's back injury may be, for purposes of this motion, considered a disability under the ADA post passage of the ADAA. *See supra* Parts II.B.2.c & IV.B.1.a.ii. Plaintiff's physical impairment could be considered to have substantially limited his "ability to perform . . . a class of jobs"—in this case, the delivery of bulk-packaged merchandise to storefronts and the passenger planes at JFK—"compared to the average person having comparable training, skills and abilities." *Krachenfels*, 2014 WL

3867560, at *14; *see also supra* Part II.B.2.c-d.  Despite the assumption, for argument's sake, of a "disability," it should be noted that the "disability" was transient and limited in time by plaintiff's doctor to "occasional" lifting over twenty-five pounds and "frequent" lifting over twenty pounds.  *See supra* Part II.C.

*Third*, plaintiff's termination qualifies as an adverse employment action.  *See supra* Parts II.C. & IV.B.1.a.iv.

Hernandez cannot satisfy the fourth element of the prime facie test—*i.e.*, that he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation.  *See supra* Part IV.B.1.a.iii.  After having had ample time and opportunity to conduct and complete discovery, the only evidence plaintiff puts forward in support of his position that he was never informed of the delivery responsibilities of the sales associate position is his own suspect testimony.  *See supra* Part II.B.2.d.  No explanation is offered for his 2008 performance review, which indicated that his personal knowledge of the requirements of a salesperson was "unsatisfactory."  *See supra* Part II.B.2.a.  No former or current salespersons who worked for International between 2006 and 2009, when plaintiff first worked for defendant, were deposed or asked to supply affidavits; nor were employees who worked for the company as salespersons in 2012 asked to explain the interview process they engaged in or the requirements of the job.

At the summary judgment hearing, which plaintiff chose not to attend though ordered to do so in a March 25, 2015 Docket Entry, it was confirmed by defendant, which had two representatives present, that plaintiff was specifically hired to perform the duties of a sales associate with delivery responsibilities including lifting.  (*See generally* Hr'g Tr.)  This corroborated the deposition testimony of Walsh-Steines, who pre-screened Hernandez, and

Jairam, plaintiff's immediate supervisor. *See supra* Part II.A.2-3 & C. Plaintiff's prior work at defendant had surely informed him of the lifting and carrying required of salespersons with delivery responsibilities.

Although at his deposition plaintiff stated that the 2012 job was identical to the salesperson job that he had held with the company between 2006 and 2009, and affirmed that Walsh-Steines "told [him] exactly what to do," plaintiff never addressed the details of his understanding of the duties of salespersons between 2006 and 2009. (*See, e.g.*, Hernandez Dep. 35:4–5, 39:23–24 ("I already worked there before, so I knew exactly what to do.").) Had plaintiff attended the hearing as ordered, he would have had the opportunity to explain. (*See generally* Hr'g Tr.) The only appropriate conclusion is that plaintiff had no explanation for his claimed lack of knowledge of a salesperson's work requirements, which included lifting.

The numerous inconsistencies between plaintiff's amended complaint, his deposition testimony, and his job application for a sales associate position with defendant, combined with his failure to appear before the court when ordered, puts the case in a position where it is has less than a "scintilla" of evidence in support of plaintiff's position that delivery responsibilities were not an essential function of his job. *See generally supra* Parts II & III. This is insufficient to defeat a summary judgment motion that establishes that the delivery duties of plaintiff's job were more than "merely marginal." *See supra* Parts III & IV.B.1.a.iii.

After the essential functions of a position have been determined, the burden is on plaintiff to demonstrate that he could have performed the job in question "with or without a reasonable accommodation." *See supra* Part IV.B.1.a.iii. An employee may not recover based on his employer's failure to engage in an "interactive process" about a reasonable accommodation if he cannot show that a reasonable accommodation existed at the time of dismissal. *Id.*

Plaintiff never asked his employer for a reasonable accommodation when he learned that he would be terminated. The available documentary evidence indicates that he told Dalipi that the company should "ignore his doctor's note." *See supra* Part II.C. At the summary judgment hearing, it was elicited that plaintiff did no more than produce the doctor's non-dispositive note to defendant. (*See* Hr'g Tr.) Hernandez argues that, even though he never mentioned his desire for a reasonable accommodation while he was employed by defendant, he could have performed the delivery responsibilities of the salesperson job if he had been allowed to make "several trips with the hand truck or folding cart," which might have involved dismantling bulk-packaged merchandise in order to transport it to its proper location. (Mem. of Law in Opp. to Summ. J. 21–22, ECF No. 34 ("Pl.'s Mem."); Hr'g Tr.) An alternative accommodation, he posits, would have been to "assign[] another salesperson[] to assist him, or assign[] the other delivery guys to carry[] the ["heavy" gray] bins and assign[] [p]laintiff to transport all other merchandise." (Pl.'s Mem. 21.)

It is conceded for the sake of argument that plaintiff could not lift bulk-packaged merchandise weighing more than twenty pounds without a reasonable accommodation. *See supra* Part II.C. The reasonable accommodations proposed, which Hernandez claims should have been part of an "interactive process," would have meant the elimination of plaintiff's essential job functions, including the *timely* transportation of bins or other bulk-packaged merchandise to the storefront and airport gates. *See supra* Part II.A.3.

Even were defendant to concede, which it does not, that a reasonable accommodation could have been made with respect to the transportation of merchandise from the delivery truck or stockroom to the storefront, plaintiff's proposed accommodations are not reasonable with respect to the timely transportation of "heavy" duty-free merchandise that multiple salespersons

may be called on at any given time to responsibly transport to airport gates. *Id.* Plaintiff's proposals either fail to take the timeliness factor of deliveries to airplanes set for takeoff at specific times into account, or amount to having others do his job.

Defendant's alleged failure to engage in an "interactive process" with plaintiff regarding a reasonable accommodation is not a basis for recovery. (*See* Pl.'s Mem. 19–20.) Reasonable accommodation does not mean elimination of a position's essential functions. *See supra* Part IV.B.1.a.iii. Plaintiff has not met his burden of suggesting the existence of a plausible accommodation. *Id.*

### b. Whether Proffered Business Reason for Termination Is Pretextual

Defendant's proffered reason for plaintiff's termination cannot be deemed pretextual. Defendant asserts that plaintiff was terminated because he was not candid in his interview that he could not perform the essential duties of a salesperson with delivery responsibilities. *See supra* Parts II.C & IV.B.1.b. Plaintiff retorts that he was never informed of the labor-intensive duties of the job or the shift that he was hired for. *See supra* Part II.B.2.d. He argues that, even if he had been informed, he could have performed his duties with a reasonable accommodation, which he posits was incumbent on defendant to provide. (Pl.'s Mem. 22.)

For the same reasons that plaintiff failed to establish that the lifting requirement was not an essential function of the salesperson job he was hired for, he cannot establish that defendant's proffered reason for plaintiff's termination is pretextual. *See supra* Part IV.2.a. Defendant fired plaintiff because he could not perform the essential functions of his job, which required him to deliver "heavy" items to the store and to airport gates. *See supra* Part II.A.3.

Summary judgment is appropriate. *See supra* Part III. International's reason for firing plaintiff was nondiscriminatory. *See supra* Part IV.B.1.b-c. This finding is dispositive and

forecloses any issue of material fact. *Id.*

Plaintiff's ADA disability discrimination claim is denied. Assuming for the sake of argument that plaintiff's disability was established, the court need not make a finding under the "regarded as" disabled prong of the ADA. *See supra* Part IV.A.1.b.ii & B.1.a.ii.c.

His claims under NYSHRL and NYCHRL are dismissed without prejudice so that they may be pursued in state court. *See supra* Part IV.B.1.

### C. Failure to Accommodate

#### 1. Law

A failure to accommodate claim is also subject to the *McDonnell Douglas* three-step burden-shifting framework. *See McMillan*, 711 F.3d at 125. To establish a prima facie failure to accommodate claim, a plaintiff must demonstrate that:

> (1) [he or she] is a person with a disability under the meaning of the ADA;
> (2) an employer covered by the statute had notice of his [or her] disability;
> (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and
> (4) the employer has refused to make such accommodations.

*Id.* at 125–26 (citation omitted); *McBride*, 583 F.3d at 97 (same). *See also supra* Part IV.B.1.b-c. (laying out law applicable to last two stages of *McDonnell Douglas* framework).

#### 2. Application

Plaintiff's failure to accommodate claim fails for two reasons. *First*, his prima facie failure to accommodate claim is dependent on his ability to establish that "with reasonable accommodation" he could have performed the essential functions of his job. *See supra* Part IV.C.1. He has failed to do so. *See supra* Part IV.B.2.a. *Second*, it has been determined that International's proffered reason for plaintiff's termination was not pretextual. *See supra* Part IV.B.2.b.

The failure to accommodate claim is denied.  The court does not make a finding under the "regarded as" prong of the ADA because the ADAAA clarified that an individual "regarded as" disabled is not entitled to a reasonable accommodation.  *See supra* part IV.A.1.b.iii.  Plaintiff's claims under NYSHRL and NYCHRL are dismissed without prejudice so that they may be pursued in state court.

**D. Retaliation**

    **1. Law**

Retaliation claims are analyzed under the three-step *McDonnell Douglas* framework.  *See Treglia*, 313 F.3d at 719 ("Claims for retaliation [under the ADA] are analyzed under the same burden-shifting framework established for Title VII cases."); *see also Castro v. City of N.Y.*, 24 F. Supp. 3d 250, 269 (E.D.N.Y. 2014) (finding that plaintiff's retaliation claim under the ADA failed because complaints to his uncle were not considered protected activity).  The Court of Appeals for the Second Circuit has described the first stage of the retaliation burden-shifting analysis as follows:

> First, the plaintiff must establish a prima facie case of retaliation by showing:  (1) participation in a protected activity; (2) that the defendant knew of the protected activity;  (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  The plaintiff's burden in this regard is *de minimis*, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.

*Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citations omitted).  "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination, and may take the form of either formal or informal complaints."  *Chan v. Donahoe*, No. 13-cv-2599, 2014 WL 6844943, at * 20 (E.D.N.Y. Dec. 4, 2014) (citations omitted); *Villavicencio v. Gure-Perez*, No. 10-cv-5748, 2014 WL 5472539, at *8 (E.D.N.Y. Oct.

30, 2014) (holding that informal opposition to discrimination may be expressed verbally to employer). The formal or informal complaint must put the employer on notice that the plaintiff believed that discrimination was occurring. *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 191 (E.D.N.Y. 2011) (internal quotation marks and citation omitted). Termination satisfies the third prong of the prima facie retaliation test. *See Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) ("To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment . . . ." (internal quotation marks and citation omitted)). "A plaintiff can successfully establish proof of causation by showing that protected activity was followed closely by discriminatory treatment. . . ." *Chan,* 2014 WL 6844943, at * 21 (internal quotation marks omitted). *See also supra* Part IV.B.1.b-c. (laying out law applicable to last two stages of *McDonnell Douglas* framework).

### 2. Application

Plaintiff makes out a prima facie case of retaliation, but fails to establish pretext.

Hernandez satisfies the four elements of a retaliation claim. *First*, plaintiff's discussion with his supervisor and the provision of a doctor's note regarding his back impairment qualifies as participating in protected activity. *See supra* Parts II.C & IV.D.1. *Second*, the defendant knew of the protected activity because plaintiff made an informal complaint to his supervisor. *Id. Third*, plaintiff's termination qualifies as an adverse employment action. *Id. Fourth*, it is undisputed that a causal connection existed between plaintiff's refusal to transport merchandise weighing twenty pounds and more, and his termination; plaintiff's protected activity was temporarily proximate to his termination. *Id.*

Pretext cannot be established. As explained above, defendant's reason for terminating plaintiff was nonpretextual and nondiscriminatory. *See supra* Part IV.B.2.b.

A retaliation claim against International does not stand.  Analogous claims under NYSHRL and NYCHRL are dismissed without prejudice so that they may be pursued in state court.

## V.    Conclusion

Defendant's motion for summary judgment with respect to the ADA is granted.

The analogous claims brought under NYSHRL and NYCHRL are dismissed without prejudice.  The magistrate judge is respectfully requested to assist the parties in settling the State and City claims to avoid burdening the state courts with this litigation.


SO ORDERED.


_____/s/ Jack B. Weinstein_____
Jack B. Weinstein
Senior United States District Judge

Dated:  April 23, 2015
          Brooklyn, New York